Filed 7/1/21  P. v. Harbor CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TRAVYON CHARLES HARBOR,<br><br>    Defendant and Appellant. | B302806<br><br>(Los Angeles County<br>Super. Ct. No. NA065766) |

APPEAL from an order of the Superior Court of Los Angeles County, William C. Ryan, Judge.  Affirmed in part and dismissed in part.

Karyn H. Bucur, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Roberta L. Davis and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Travyon Charles Harbor was convicted of second degree murder and premeditated attempted murder in 2005. Approximately 14 years later, he filed a petition for writ of error *coram nobis* claiming that the prosecutor failed to disclose secret recordings of witness interviews, and that newly discovered evidence of witnesses recanting their trial testimony proved his actual innocence. Harbor also requested postconviction discovery of evidence related to the recorded witness interviews, among other things. The court denied Harbor's petition and his request for discovery. We affirm the court's denial of Harbor's petition and dismiss his appeal of the court's denial of his request for postconviction discovery.

## BACKGROUND

I.    Trial

The following factual summary is taken from our opinion in Harbor's direct appeal. (*People v. Harbor* (Nov. 20, 2007, B187911) [nonpub. opn.].)

"[A.]   *Prosecution evidence.*

"Dwayne Saulsberry testified that, on July 26, 2002, at about 6:00 p.m., he drove Kieanii K. and her brother home to . . . East Cruces Street in Wilmington. Saulsberry and Kieanii [K.]'s uncle, Timothy Fox, got into an argument. Kieanii [K.] told Saulsberry to leave. As he was returning to his car, Saulsberry heard Fox whistle. Then, just as Saulsberry started to drive away, a vehicle 'came charging at' him. To avoid a head-on collision, Saulsberry swerved. The oncoming vehicle sideswiped Saulsberry's car. Saulsberry heard gunfire, six or seven rounds fired in rapid succession, as he kept driving away.

2

He reached the end of the block and turned onto Watson Avenue. Saulsberry did not see who was shooting at him.

"When the police subsequently searched Saulsberry's car, they found 11 rounds of .32-caliber ammunition. Saulsberry claimed the ammunition was old and that he did not know it was in his car. He denied having had a gun with him on the day of the shooting.

"Kieanii [K.] told police[1] that during the argument between Fox and Saulsberry, Fox 'was basically belittling him because of his handicap.' (Saulsberry was missing his right leg and he had suffered some kind of permanent injury to his left arm.) Saulsberry pulled a gun from his pocket, showed it to Fox and said, 'I'm not a punk. I can take care of myself.' Kieanii [K.] told Saulsberry, 'Look, you better get out of here. They are gonna shoot you.' According to Kieanii [K.], Saulsberry 'went back to his car, threw the gun on the floorboard, got into his car, and . . . started to take off. And then she saw [defendant Harbor] come from a parked car, shoot at [Saulsberry, who] collided into a car that was coming up the street, and then . . . [Harbor] began to shoot as [Saulsberry] kept going west until he got to Watson.'[2]

---

[1] "At trial, Kieanii [K.] denied having been in Saulsberry's car that day. She testified Saulsberry arrived at her house unexpectedly. After speaking to him briefly, she closed the front door and did not witness what happened outside. At the same time, however, Kieanii [K.] acknowledged she had told the police Harbor shot at Saulsberry."

[2] "Watson Avenue was the first cross-street west of the block of East Cruces on which both Kieanii [K.] and Harbor lived."

3

Kieanii [K.] did not see anyone except Harbor fire a gun during this incident.

"Regina Smith testified she lived with her boyfriend, Willie Harbor, who was defendant Harbor's uncle, across the street and west of Kieanii [K.]'s house. At the time of the shooting, Smith was sitting in her Volkswagen Rabbit in front of the Harbor house smoking PCP. Smith told police she saw Saulsberry run to his car and start to drive away. A blue Cadillac appeared and collided with Saulsberry, who kept driving down East Cruces. Then Harbor, who was standing in the driveway of the Harbor house, started shooting at Saulsberry: '[T]hen the car went towards Watson on Cruces and [Harbor kept] shooting at the car . . . .' When Saulsberry reached Watson Avenue, he turned left and Smith heard more gunshots. Later, after the ambulance came, Smith went into the house and saw Harbor trying to climb through the back window. When she asked what he was doing Harbor said, 'I got to get out of here.' Smith did not see anyone besides Harbor shooting a gun during the incident.

"Walfred Marroquin and his wife, Rosa Garcia, lived . . . across Watson Avenue from, and west of, both Kieanii [K.]'s house and the Harbor house. When the shooting occurred, Marroquin and Garcia were just returning home. Garcia got out of the car and went to open the driveway gate. Then she fell to the ground. Marroquin ran over and saw she was bleeding from the head. Garcia never regained consciousness and she died two days later. It turned out she was six weeks' pregnant. Detective Goodman attended the autopsy and saw a bullet entry wound in the side of Garcia's head.

"Leticia Huerta lived . . . a couple of houses west of Kieanii [K.]'s house. Huerta heard the gunshots and, when the

4

shooting was over, she looked out her bedroom window. She saw Fox shaking hands with Harbor on the sidewalk across the street. Huerta told police she heard a single shot, a pause, and then rapid gunfire.

"Huerta's husband, Rigoberto Martinez, looked out the living room window when the shooting stopped. He saw Harbor by the sidewalk across the street, crouched behind a white Cherokee which was parked in front of 1405 East Cruces Street, behind Smith's car. Harbor appeared to be putting a gun into his waistband. Martinez then saw Fox and Harbor shaking hands in a congratulatory way.

"Five .40-caliber bullet casings were found spread out in front of 1405 East Cruces Street. One casing was found on the sidewalk close to a gate belonging to 1405 East Cruces Street, and four casings were found in the driveway area. Detective Goodman testified this physical evidence was consistent with Martinez's statement about where he had seen Harbor when the shooting stopped.

"Detective Goodman testified it appeared gunfire had hit the front of a Buick Regal, which was parked very close to where Garcia had been standing when she was shot.

"[B]. *Defense evidence.*

"Harbor's uncle, Willie, testified he was inside the house when he heard shooting. He went outside when it stopped and saw Smith sitting in her car, smoking cocaine. Smith said to him, 'It's another drive-by shooting.' Willie did not see Harbor or anyone with a gun."

"Harbor's cousin, Tim Fox, testified he had been at Kieanii [K.]'s house that afternoon. He denied having seen Saulsberry there. Fox testified he was in the yard when he heard

5

shooting and he got on the ground to avoid being hit. When he got up, he saw Smith in her parked car and went over to check on her. Fox did not see Harbor; nor did he see anyone with a gun. He denied having told police a car drove up, that the driver spoke to Fox and a man named Shane, but Fox ignored the driver because he didn't know him.

"[C]. *Rebuttal evidence*.

"Detective Goodman testified he interviewed Fox, who said he was in front of Kieanii [K.]'s house, talking to someone named Shane, when a man drove up and said, ' "What's up, homey?" or, ' "Hey, what's up?" ' Fox did not know the man, so he ignored him. The man drove away and a few seconds later Fox heard five or six gunshots." (*People v. Harbor*, *supra*, B187911 [pp. 2–5].)

II.    Procedure

On August 25, 2005, a jury convicted Harbor of second degree murder (Pen. Code,[3] § 187, subd. (a)) and premeditated attempted murder (§§ 664, 187, subd. (a)), with firearm and prior serious felony conviction enhancements (§§ 667, subd. (a)–(i), 12022.53). The court sentenced Harbor to 200 years to life.

Harbor moved for a new trial on October 5, 2005, arguing that there was newly discovered evidence that he acted in self-defense. He submitted interview statements from Aretha Bonner who stated she saw Saulsberry fire multiple shots towards Harbor, and Natealie Sherman who stated that only Saulsberry and an unidentified Hispanic man fired shots towards the victim Garcia. The court denied the motion and Harbor appealed.

---

[3] All further statutory references are to the Penal Code.

6

We affirmed the court's denial of Harbor's motion for a new trial but remanded the matter for resentencing. On remand, Harbor was resentenced to 95 years to life.

In May 2008, Harbor moved again for a new trial, arguing that newly discovered evidence showed that he acted in self-defense and the prosecutor failed to disclose exculpatory evidence. In addition to the interview statements from Bonner and Sherman, Harbor attached handwritten investigation notes from two detectives that indicated they interviewed a witness who saw Saulsberry shoot three times from his car. The court construed Harbor's motion for a new trial as a petition for writ of habeas corpus and denied the petition. "The court finds that the 'new evidence' of . . . Sherman was previously presented in a new trial motion which was denied and affirmed on appeal. The statement of . . . Bonner does not exonerate the defendant as to the final two shots and does not justify a habeas corpus hearing."

From July 2008 through March 2018, Harbor filed multiple habeas petitions, including three in this court, two in our Supreme Court, and one in the United States District Court. Each petition was denied.

In April 2019, Harbor filed another habeas petition in the superior court. The petition alleged that: (1) the prosecutor committed a *Brady*[4] violation by failing to disclose evidence related to detectives' recordings of witness interviews; (2) the prosecutor and police obtained Smith's false testimony by bribing her with promises to return her children to her custody and to help her relocate; (3) the police obtained Kieanii K.'s false testimony by threatening to remand her to juvenile custody; and

---

[4] *Brady v. Maryland* (1963) 373 U.S. 83.

7

(4) Kieanii K.'s and Smith's recantations demonstrated that Harbor was actually innocent. Along with his petition, Harbor submitted declarations from Kieanii K. and Smith signed in 2010, a police tape recording log, and the same handwritten investigation notes from detectives. Kieanii K.'s declaration stated that she saw Harbor walk toward Saulsberry before Saulsberry fired once in Harbor's direction. Kieanii K. also stated that, "While I later told detectives that [Harbor] was the only person shooting that was untrue. I said that after the detectives told me that I could not have any adults or my guardian present during the interview. Detectives told me that they knew that I saw . . . Harbor do the shooting. I was a 14[-]year[-]old girl at the time and the officer[s] were very demanding and intimidating to me. I was frightened and told them what they wanted to hear, the detectives gave me the impression that they would have me remanded to jail if I didn't tell them . . . Harbor was the only person shooting that day, although they didn't actually say that." Smith's declaration stated that she lied to detectives when she told them she saw Harbor shoot because she was under the impression that helping the police would result in getting custody of her children and relocation.

In May 2019, the court denied the petition. The court found that Harbor's "claims of witness tampering and bribery and his actual innocence are successive in that those two claims were denied in the court's September 22, 2017 order denying one of [Harbor]'s prior habeas petitions." The "court is aware of at least three prior petitions filed by [Harbor] in this court alone. Furthermore, all exhibits attached to the Petition predate the previous petition that was denied in 2017. [Harbor] offers no

8

explanation as to why he was unable to raise these current contentions in his prior petitions."

One month later, Harbor petitioned for writ of error *coram nobis*, repeating the same allegations contained in his previously rejected habeas petition, including the claims that the prosecutor failed to disclose the existence of secretly recorded witness interview tapes, the police bribed Smith and threatened Kieanii K. to elicit their false testimony, and Harbor is actually innocent based on Kieanii K.'s recantation testimony.[5]  Harbor submitted the same exhibits previously attached to his last habeas petition, including the handwritten investigation notes, the police tape recording log, and Kieanii K.'s declaration.

The People filed an informal response, arguing that Harbor's claims should have been presented in a petition for writ of habeas corpus and, in any event, his *coram nobis* petition was untimely and successive.

Harbor also moved for postconviction discovery under section 1054.9.  He requested the tape recordings of witness statements; detectives' handwritten notes of all those recorded witness statements; the taped interview of a witness who was interviewed by Detective Goodman who stated that he or she saw Saulsberry shoot at Harbor on the day of the murder; and any other known exculpatory, material, or impeachment evidence favorable to Harbor.

On November 1, 2019, the court denied Harbor's petition for writ of error *coram nobis* and his motion for postconviction

---

[5] Harbor's petition did not rely on Smith's declaration, however, in his reply brief, Harbor asks us to consider Smith's declaration as well.

discovery.  The court agreed with the People that Harbor's claims should have been presented through a petition for writ of habeas corpus, but concluded, regardless of the petition's label, Harbor was not entitled to relief.  The court found that Harbor's petition was successive and that it was "essentially a request for reconsideration of the motion for new trial that was made in 2005, as well as the first petition for writ of habeas corpus filed in 2008, and numerous other petitions, where [Harbor] claimed that the Office of the District Attorney failed to produce or suppressed exculpatory evidence."  With respect to the postconviction discovery motion, the court found that Harbor had not shown a good faith effort to obtain discovery materials from trial counsel that were unsuccessful.  It appears that Harbor's discovery request was denied without prejudice.

Harbor appealed.

## DISCUSSION

Harbor contends the court erred in denying his petition for writ of error *coram nobis* and his motion for postconviction discovery under section 1054.9.  Both contentions fail.

I.    Petition for writ of error *coram nobis*

As an initial matter, the People argue that Harbor's appeal should be summarily dismissed because he should have presented his claims in a petition for writ of habeas corpus. Harbor concedes that he should have filed a habeas petition, but asks us to exercise our original jurisdiction and consider his *coram nobis* petition as one for habeas.  Irrespective of the

10

petition's label, we find that it is procedurally barred as untimely and successive.[6]

A.   *Timeliness*

Both habeas petitions and *coram nobis* petitions must be filed within a reasonable time after the petitioner or counsel knew, or with due diligence should have known, the facts underlying the claim as well as the legal basis of the claim. (*People v. Kim* (2009) 45 Cal.4th 1078, 1097.)  The petition must be filed "as promptly as the circumstances allow." (*In re Clark* (1993) 5 Cal.4th 750, 765, fn. 5.)  A court will not consider the merits of a petition brought after substantial delay unless the petitioner can show good cause.  (*In re Robbins* (1998) 18 Cal.4th 770, 780.)  Delay is "measured from the time the petitioner or his or her counsel knew, or reasonably should have known," of the grounds on which he seeks relief.  (*Ibid.*)

Here, Harbor's petition is untimely because he was actually aware of the facts underlying his claims at the time of trial or, at the latest, in 2010.  Harbor knew about the secretly recorded witness interviews at the time of trial because Detective Goodman admitted he recorded witnesses without their consent.  Indeed, Smith's recorded interview was played to the jury, during which, she discusses her children's safety and possible relocation.

---

[6] While the court's denial of a petition for writ of error *coram nobis* is reviewed for abuse of discretion and we review a petition for writ of habeas corpus for whether it states a prima facie case, our standard of review does not change the outcome here. (*People v. Romero* (1994) 8 Cal.4th 728; *People v. Mbaabu* (2013) 213 Cal.App.4th 1139, 1146.)  Under either standard, our conclusion that the petition is procedurally barred does not change.

11

Regarding Harbor's claim that Smith was bribed by police with promises to gain custody of her children, this evidence was known to Harbor at the latest by 2010 when Smith signed her declaration. Harbor has not explained the delay in presenting Smith's declaration. As such, he failed to demonstrate good cause for the delay.

Similarly, Harbor's claims related to Kieanii K.'s testimony are untimely. At trial, Kieanii K. testified that she was scared of detectives and that they denied her request to have a guardian present during her interview. She also testified that, during her interview, she told detectives "what they wanted to hear" to avoid jail time. Harbor was therefore aware of the problems with Kieanii K.'s testimony at the time of trial. To the extent Harbor relies on Kieanii K.'s recantation testimony that she saw Saulsberry shoot at him, Harbor has known about this version of events since 2010 as well. Again, without an explanation, Harbor has failed to demonstrate good cause for the substantial delay.

As Harbor's claims are nearly a decade old or older, his petition is untimely.

### B. *The petition is successive.*

Harbor's petition also fails because it is successive. "As with petitions for writs of habeas corpus, one seeking relief via *coram nobis* may not attack a final judgment in piecemeal fashion, in proceedings filed seriatim, in the hopes of finally convincing a court to issue the writ." (*People v. Kim*, *supra*, 45 Cal.4th at p. 1101.) A petitioner is not permitted to try out his or her contentions by successive proceedings attacking the validity of the judgment. (*In re Connor* (1940) 16 Cal.2d 701, 705.) Courts will not consider repeated petitions presenting claims that were previously rejected unless there was a change in

the applicable law or facts.  (*In re Martinez* (2009) 46 Cal.4th 945, 956.)  " 'Such rules are necessary both to deter use of the writ to unjustifiably delay implementation of the law, and to avoid the need to set aside final judgments of conviction when retrial would be difficult or impossible.' " (*Ibid.*)  "Successive petitions . . . waste scarce judicial resources as the court must repeatedly review the record of the trial in order to assess the merits of the petitioner's claims and assess the prejudicial impact of the constitutional deprivation of which he complains."  (*In re Clark*, *supra*, 5 Cal.4th at p. 770.)

Here, the record shows that the instant petition is the latest of many that raises similar or identical claims.  Notably, after obtaining the 2010 declarations of Smith and Kieanii K., Harbor has filed multiple habeas petitions in state and federal courts.  In denying Harbor's most recent habeas petition, the court noted that Harbor's "actual innocence [claim is] successive in that [the] . . . claim[ ] w[as] denied in the court's September 22, 2017 order denying one of [Harbor]'s prior habeas petitions." Indeed, Harbor's petition for writ of error *coram nobis* repeats the same allegations contained in his previously rejected habeas petitions, including the claims that the prosecutor failed to disclose *Brady* evidence of the secretly recorded witness interview tapes, the police bribed Smith and coerced Kieanii K. to obtain their false testimony, and Harbor is actually innocent based on Kieanii K.'s recantation testimony.  In fact, he submitted the same exhibits previously attached to his most recent habeas petition that was denied just one month earlier.

Accordingly, Harbor's instant petition is barred as successive.

13

C.    *Harbor has not met his burden to show that new*
*evidence demonstrates he is actually innocent.*

Even though Harbor's petition is untimely, successive, and fails to demonstrate good cause for the substantial delay, he nevertheless urges us to consider the merits of his petition because Kieanii K.'s and Smith's declarations demonstrate he is actually innocent of Garcia's murder.

We will consider the merits of an untimely and successive petition if the petitioner demonstrates that he "is actually innocent of the crime or crimes of which he or she was convicted." (*In re Robbins, supra,* 18 Cal.4th at p. 780.)  " 'Absent the unusual circumstance of some critical evidence that is truly "newly discovered" under our law, or a change in the law, such successive petitions rarely raise an issue even remotely plausible, let alone state a prima facie case for actual relief." (*Briggs v. Brown* (2017) 3 Cal.5th 808, 843.)  In the past, to obtain relief on the grounds that newly discovered evidence demonstrated the petitioner's actual innocence, he or she had to show that the evidence cast fundamental doubt on the accuracy and reliability of the proceedings, undermined the entire prosecution case, and pointed unerringly to innocence.  (*In re Lawley* (2008) 42 Cal.4th 1231, 1239.)  Effective January 1, 2017, a petitioner need only present "[n]ew evidence . . . that is credible, material, presented without substantial delay, and of such decisive force and value that it would have more likely than not changed the outcome at trial." (§ 1473, subd. (b)(3)(A); *Larsen v. California Victim Comp. Bd.* (2021) 64 Cal.App.5th 112, 132.)  " '[N]ew evidence' means evidence that has been discovered after trial, that could not have been discovered prior to trial by the exercise of due diligence, and is admissible and not merely cumulative, corroborative,

14

collateral, or impeaching." (§ 1473, subd. (b)(3)(B).) " 'The petitioner bears the burden to plead and then prove all of the relevant allegations.' " (*Robinson v. Lewis* (2020) 9 Cal.5th 883, 898.)

Harbor cannot meet his burden. The only evidence in Smith's declaration not presented at trial was her statement that she lied to detectives because she thought it would help gain custody of her children. The jury heard Smith's admission that she initially lied to detectives because she did not like Harbor and did not get along with him. She also testified that she did not see the shooter because she ducked down when she heard the shots. The jury also heard Smith's recorded interview where she discussed her children's safety and possible relocation if she testified against Harbor. Considering the jury heard evidence that Smith lied to detectives and still found Harbor guilty, it is unlikely that an additional reason for Smith's untruthfulness would have changed the outcome of the trial.

Kieanii K.'s new testimony also does not satisfy Harbor's burden to show his actual innocence based on new evidence. Harbor argues that Kieanii K.'s statement that Saulsberry fired at him first necessarily establishes that he acted in self-defense or defense of others. Even if the jury heard Kieanii K.'s new testimony, it would consider it in conjunction with her prior identification, recantation, and impeachment. To date, Kieanii K. has given several different accounts of what happened on the night of the shooting. She initially told detectives that she saw Harbor shoot at Saulsberry and identified him as the shooter in a six-pack. She also identified Harbor as the only shooter at the preliminary hearing. Then, at trial, Kieanii K. recanted and said she did not see Harbor that night. When confronted with

15

her previous statements identifying Harbor as the shooter, Kieanii K. stated she could not recall her prior statements and admitted she lied to detectives. Kieanii K.'s 2010 declaration offers yet another version of events where Saulsberry shot at Harbor. Moreover, recantations are viewed with suspicion. (*In re Cox* (2003) 30 Cal.4th 974, 998.) In this context, Kieanii K.'s 2010 declaration, further recanting her prior statements, does not have such decisive force that it would have more likely than not changed the outcome at trial. More fundamentally, this issue was already disputed at trial when Kieanii K. first recanted. In other words, Kieanii K.'s declaration is "impeaching" and does no more than conflict with trial evidence, so by definition, it is not " 'new evidence.' " (§ 1473, subd. (b)(3)(B); *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1247.)

Further, there was other evidence that Saulsberry did not shoot at Harbor. Saulsberry testified that he did not have a gun with him on the day of the shooting. The jury also heard Smith's recorded interview in which she identified Harbor as the only shooter. Another witness saw Harbor put a gun into his waistband after hearing the shooting. The shell casings found at the scene were consistent with the witness's statement of where Harbor was seen when the shooting stopped.

Thus, Harbor's claim of actual innocence fails.

II.     Postconviction discovery motion

Harbor contends the court also erred when it denied his request for postconviction discovery under section 1054.9. Like the court's denial of Harbor's petition, review of the court's denial of his request for discovery is also procedurally barred.

" 'It is settled that the right of appeal is statutory and that a judgment or order is not appealable unless expressly made so

16

by statute.' " (*People v. Mazurette* (2001) 24 Cal.4th 789, 792.)  A criminal defendant may appeal from a final judgment or from any order made after judgment, affecting his or her substantial rights.  (§ 1237.)  The California Supreme Court explained in *In re Steele* (2004) 32 Cal.4th 682, 688 that "those who seek discovery under section 1054.9 because they are preparing to file or have filed a petition for writ of habeas corpus challenging a judgment of death or life without the possibility of parole should generally first make the discovery motion in the trial court that rendered the judgment.  After the trial court has ruled, either party may challenge that ruling by a petition for writ of mandate in the Court of Appeal."

Here, to challenge the court's ruling denying his motion for postconviction discovery, Harbor needed to file a petition for a writ of mandate.  He did not do so and his challenge to the court's denial of his request for discovery is dismissed on that ground.

## DISPOSITION

The portion of the order denying Travyon Charles Harbor's petition for error *coram nobis* is affirmed while his appeal of the court's denial of his motion for postconviction discovery is dismissed.

NOT TO BE PUBLISHED.


KALRA, J.*


We concur:



LAVIN, Acting P. J.



EGERTON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.